NOT DESIGNATED FOR PUBLICATION

No. 112,811

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STORMONT-VAIL HEALTHCARE, INC., and
COTTON-O'NEIL CLINIC,
*Appellees*,

v.

The BOARD of COUNTY COMMISSIONERS for
SHAWNEE COUNTY, KANSAS,
*Appellant*,

and

CITY of TOPEKA, KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed May 13, 2016. Reversed and remanded with directions.

*Richard V. Eckert* and *James M. Crowl*, of Office of the County Counselor, of Topeka, for appellant.

*E. Lou Bjorgaard Probasco*, of Probasco & Assoc., P.A., of Topeka, for appellees Stormont-Vail and Cotton O'Neil.

*Seth A. Lowry*, assistant city attorney, and *Shelly Starr*, chief of litigation, of Topeka, for appellee City of Topeka.

Before BUSER, P.J., ATCHESON and SCHROEDER, JJ.

1

*Per Curiam*:  Deciding cross-motions for summary judgment based on stipulated facts, the Shawnee County District Court found Shawnee County rather than the City of Topeka liable for medical expenses owed Stormont-Vail Healthcare and Cotton-O'Neil Clinic for treatment provided to a man arrested on criminal charges. We reverse and remand for further proceedings because the stipulation left material issues of fact unresolved and liability could be imposed on Shawnee County only by drawing inferences against it—contrary to the rules governing summary judgment. We also find the stipulated facts do not support the government entities' arguments for a statute of limitations bar to the medical providers' action for payment.

## FACTUAL AND PROCEDURAL HISTORY

Stormont-Vail Healthcare and Cotton-O'Neil Clinic filed a civil action in the district court on September 25, 2012, against Shawnee County and the City of Topeka for the cost of medical services provided to Jesse Dimmick. A fugitive from Colorado, Dimmick was shot as he was being arrested and taken into custody on September 12, 2009, in rural Shawnee County. The medical providers are united in interest and have been represented by the same lawyer. We have no reason to differentiate between them, so we simply refer to them as Stormont-Vail.

Stormont-Vail, the County, and the City each filed a motion asking the district court to enter judgment in its favor as a matter of law, obviating the need for a trial on the merits of the claim for payment. The lawyers worked out a stipulation of facts consisting of 35 paragraphs outlining circumstances relevant to Dimmick's capture, injury, and treatment. The stipulation formed the factual foundation for the summary judgment motions and supporting memoranda. None of the parties supplemented the stipulation with additional statements of uncontroverted fact. We do not recite the stipulation in full but summarize particular aspects of it for context.

Apparently on the lam from Colorado authorities, Dimmick stole a minivan in Geary County and got on I-70 headed east with a Geary County Sheriff's officer in pursuit. The Geary County officer yielded the chase to a Kansas Highway Patrol trooper. As we read the stipulated facts, Dimmick left I-70 in the vicinity of Dover, an unincorporated community in western Shawnee County. At some point, he drove the minivan over stop-sticks and eventually ended up in the front yard of a Dover couple.

Dimmick forced his way into the home and held the couple hostage. In the meantime, as stated in the stipulation: "A response team comprised of officers from the Kansas Highway Patrol, Topeka Police Department[,] and deputies with the Shawnee County Sheriff's Department . . . responded to the residence." The couple escaped when Dimmick fell asleep. Response team participants then went inside to arrest Dimmick.

The stipulation states: "Members of the response team repeatedly ordered Dimmick to lie down on the ground and to place his hands in a position where they were visible to law enforcement. . . . . Dimmick eventually complied with the order." As a Shawnee County Sheriff's deputy "move[d] in to handcuff Dimmick," a sergeant with the Topeka Police Department had a rifle pointed at Dimmick. According to the stipulation, the sergeant perceived Dimmick to move his hands, balking at being restrained. The sergeant then stepped on Dimmick's right wrist and forearm and ordered Dimmick not to move. As the sergeant attempted to get Dimmick to comply, the rifle discharged accidentally. The shot struck Dimmick in the back. The sergeant made a request to "emergency dispatch" for an ambulance. An ambulance arrived. The emergency medical personnel treated Dimmick and then transported him to Stormont-Vail, accompanied by a Shawnee County deputy.

Dimmick was treated at Stormont-Vail through September 29, 2009. During that time, Dimmick was not free to leave the hospital and was shackled to his bed. He was also under guard throughout his hospitalization. The stipulation states that Shawnee County deputies "did participate in guarding Dimmick." But that paragraph is phrased in

3

a way that at least implies law enforcement officers from other agencies may have guarded Dimmick some of the time. The stipulation notes that on September 23, Dimmick was charged in Shawnee County District Court with three serious felonies and several misdemeanors and was convicted in 2010 of some of the felony and misdemeanor charges. The stipulation states Stormont-Vail provided $33,834.82 in medical services to Dimmick at the applicable Medicaid rate and Cotton-O'Neil provided $8,731.60 in medical services. We know from the argument of counsel that those amounts are far less than the value of the services at the "usual and customary" rates.

LEGAL ANALYSIS

*Introduction and Governing Legal Principles*

There is a great deal we don't know based on the stipulation, and we cannot augment our review of the summary judgment ruling with information conveyed in the lawyers' arguments on appeal. The operative facts for purposes of summary judgment are confined to the stipulation.

As a result, we have virtually no information about the "response team" that effected Dimmick's capture (and injury). We have no idea if there is any sort of formal interagency agreement or even a custom and practice about the formation and operation of such teams. We don't know if the participating law enforcement agencies had an understanding—formal or informal—about allocating liability should a response team's actions go awry.

Specific to this response team, we have no indication how many officers participated, only that personnel from the Highway Patrol, the Shawnee County Sheriff's Department, and the Topeka Police Department were involved. The stipulation does not address how the participating officers parceled out duties at the scene. Did an officer from one of the agencies assume operational control and direct the others? Or was this a

4

willy-nilly exercise by the officers acting in a mostly uncoordinated takedown of Dimmick? In other words, was there a captain of the team? Those are neither idle nor academic fermentations of an overactive appellate review given the statutory authority and pertinent caselaw governing the liability of law enforcement agencies for medical care provided to persons they have in custody.

In 2006, the Kansas Legislature passed K.S.A. 22-4612 to regulate the obligation of law enforcement agencies to pay for medical care provided individuals they hold or detain. The statute, in pertinent part, provides:

> "[A] county, a city, a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol shall be liable to pay a health care provider for health care services rendered to persons in the custody of such agencies the lesser of the actual amount billed by such health care provider or the medicaid rate." K.S.A. 2015 Supp. 22-4612(a).

The statute, however, does not define "custody" for purposes of triggering liability. The Kansas Supreme Court construed K.S.A. 2015 Supp. 22-4612 in *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1006, 348 P.3d 602 (2015), and held the obligation to pay for medical care falls on "the entity having custody of the indigent offender at the time the decision is made to obtain medical treatment for the offender." Ultimately, the stipulated facts do not directly address that point with sufficient clarity to warrant summary judgment.[1]

[1]A government entity is not liable for medical costs under K.S.A. 2015 Supp. 22-4612 if an individual in custody has insurance or a similar contract right to have a third-party pay. There is no alternative payor in this case.

A party seeking summary judgment has the obligation to show, based on appropriate evidentiary materials, there are no disputed issues of material fact and judgment may, therefore, be entered in its favor as a matter of law. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City*

*of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In essence, the movant argues there is nothing for a jury or a trial judge sitting as factfinder to decide that would make any difference. The party opposing summary judgment must then point to evidence calling into question a material factual representation made in support of the motion. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. If the opposing party does so, the motion should be denied so a factfinder may resolve that dispute. In addressing a request for summary judgment, the trial court must view the evidence most favorable to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. An appellate court applies the same standards in reviewing the entry of a summary judgment. The Kansas Supreme Court reiterated those principles in *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1204, 308 P.3d 1238 (2013). Because entry of summary judgment amounts to a question of law—it entails the application of legal principles to uncontroverted facts—an appellate court owes no deference to the trial court's decision to grant the motion and review is unlimited. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009); *Golden v. Den-Mat Corp.*, 47 Kan. App. 2d 450, 460, 276 P.3d 773 (2012).

Merely because each party in a case has filed a motion for summary judgment, the district court has no broader authority to grant one of the motions. Each motion must be separately and independently reviewed using the standards we have outlined. *Wheeler v. Rolling Door Co.*, 33 Kan. App. 2d 787, 790-91, 109 P.3d 1255 (2005); *Jones v. Noblit*, No. 100,924, 2011 WL 4716337, at *1 (Kan. App. 2011) (unpublished opinion). In short, the filing of cross-motions does not afford the district court a license to decide a case on summary judgment.

*Liability under K.S.A. 2015 Supp. 22-4612*

6

In its brief ruling granting summary judgment to Stormont-Vail against Shawnee County, the district court concluded as a matter of law that the County had custody of Dimmick for purposes of K.S.A. 2015 Supp. 22-4612. The district court relied on evidence in the stipulation that Shawnee County Sheriff's deputies "were present at the scene of [Dimmick's] injury," a deputy handcuffed Dimmick, a deputy rode in the ambulance, and deputies participated in guarding Dimmick during his hospital stay. But those facts are anything but conclusive as to liability under K.S.A. 2015 Supp. 22-4612.

First, of course, law enforcement officers from the City of Topeka and the Kansas Highway Patrol were also present and participated in the response team. So that fact is equally indicative of their potential liability as it is of Shawnee County's.

A Sheriff's deputy was physically attempting to handcuff Dimmick. During that process, the Topeka police sergeant accidently shot Dimmick. But Dimmick almost certainly was in custody before then. Dimmick's freedom of movement had already been sufficiently restricted that he was functionally under arrest. See *Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010) (Suspects are in "*Miranda* custody" if they have been formally arrested or their freedom of movement has been restrained to a degree equivalent to a formal arrest.); *United States v. Guzman-Padilla*, 573 F.3d 865, 885 (9th Cir. 2009) (individual may be considered under arrest if circumstances are such a reasonable person would not feel free to leave); *State v. Bramlett*, No. 112,329, 2015 WL 3632572, at *2 (Kan. App. 2015) (unpublished opinion) ("A person is in custody if he or she has been formally arrested or has been deprived of his or her freedom in a significant way functionally equivalent to an arrest."). Here, before being handcuffed, Dimmick was on the floor in a prone position with a rifle—in the hands of a Topeka police officer—trained on him. He was likely in custody at that point and may have been even before then.

The precise question, however, turns on which law enforcement agency had custody of Dimmick when the decision to request medical assistance was made. The

7

stipulated facts outlining the injury and explaining who was doing what at the time offer, at best, only circumstantial evidence about the agency having custody of Dimmick. To find Shawnee County liable requires drawing inferences from those circumstances, and those inferences necessarily are adverse to the County. But the rules governing summary judgment preclude drawing inferences adverse to the party resisting the motion, here Shawnee County.

Likewise, evidence that a deputy accompanied Dimmick to Stormont-Vail and deputies, among other law enforcement officers, guarded Dimmick during his extended convalescence there could be considered circumstantially in determining what agency had custody of him when the call for the ambulance went out. But those after-the-fact circumstances bear on the issue only inferentially. That is, because Shawnee County deputies guarded Dimmick, a person could infer the County had custody of him before then. The conclusion, however, rests on inferences adverse to Shawnee County and, therefore, cannot support the district court's summary judgment.

The City of Topeka points out (and we acknowledge) its police officers have very limited authority to act outside the municipality's boundaries. K.S.A. 2015 Supp. 22-2401a. Those circumstances include when another law enforcement agency asks for assistance in an area within its jurisdiction. K.S.A. 2015 Supp. 22-2401a(2)(b). The stipulated facts, however, are conspicuously silent about how any City of Topeka police officers became part of the response team. Even if we were to assume Shawnee County or the Highway Patrol sought the City's help in corralling Dimmick, any Topeka police officers honoring that request would not automatically become borrowed servants of the requesting agency for liability purposes. See *Bright v. Cargill, Inc.*, 251 Kan. 387, 404-05, 837 P.2d 348 (1992) (outlining borrowed-servant liability and test for determining if employee has been borrowed). Nothing in the stipulated facts would directly support or negate liability on that basis.

8

The stipulated facts show that the City of Topeka sergeant called for the ambulance. Arguably, that implies the sergeant had custody of Dimmick or at least had the operational authority to make the request for medical assistance. But the conclusion would be only an inference—just as the circumstances pointing toward Shawnee County's liability under K.S.A. 22-4612 are inferences.

Had this been a bench trial on the stipulated facts, the district court could have drawn reasonable inferences for or against any party as those facts might permit. And the district court could have rendered judgment accordingly. But a district court's treatment of the facts and scope of review is considerably more restrained on summary judgment. We express no opinion on how the case ought to be decided in a trial on the stipulated facts. The parties haven't presented the case that way, and our views would be both speculative and presumptuous.

As we have said, simply because all of the parties request summary judgment and agree on the factual record for deciding those requests, the district court cannot then enter judgment if the evidence fails to establish liability as a matter of law. See *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 591-93 & ns.2, 3 (6th Cir. 2001) (discussing difference in judicial review between cross-motions for summary judgment on stipulated facts and bench trial on stipulated facts under comparable federal procedural rules); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (summary judgment may be inappropriate when parties agree on facts but dispute inferences to be drawn); *Sherwood v. Washington Post*, 871 F.2d 1144, 1145, 1147-48 & n.4 (D.C. Cir. 1989); *cf. Klein v. Oppenheimer & Co.*, 281 Kan. 330, 130 P.3d 569 (2006) (court reverses, in part, and remands summary judgment granted on stipulated facts because record lacked sufficient information to support necessary legal determination for liability). As we have also said, the parties did not agree alternatively to have the district court treat the submissions as a bench trial on the stipulated facts. See *Johnson v. Westhoff Sand Co.*, 31 Kan. App. 2d 259, 267, 62 P.3d 685 (party's agreement to bench trial on stipulated facts should be "explicit and unequivocal"), *rev. denied* 275 Kan. 964 (2003). Nor did they

agree that the stipulation contained all of the potentially relevant evidence—it plainly did not. See *B.F. Goodrich Co.*, 245 F.3d at 593 & n.3.

Accordingly, the district court erred in granting summary judgment for Stormont-Vail and against Shawnee County based on the stipulated facts. The stipulation fails to show as a matter of law that Shawnee County had custody of Dimmick at the time the request for medical assistance was made.

*Statute of Limitations*

Both Shawnee County and the City of Topeka also sought summary judgment on the grounds Stormont-Vail filed this action after the statute of limitations had run. Everyone agreed that the 3-year limitations period in K.S.A. 60-512(2) for an action "upon a liability created by a statute other than a penalty or forfeiture" governs the claim for medical expenses. The district court so ruled. Nobody has challenged that ruling on appeal. We, therefore, have no reason or basis to say otherwise and accept that determination.

The more challenging question is when Stormont-Vail's cause of action accrued, thereby triggering the statute of limitations. The parties, not surprisingly, have ventured different approaches. On appeal, Shawnee County suggests the 3-year limitations period should be measured backward from the date Stormont-Vail filed its action. The City of Topeka argues the cause of action accrued on the first day Dimmick received medical care at Stormont-Vail. But Stormont-Vail likens the medical expenses to an open account that came due when Dimmick was discharged. The district court held Stormont-Vail's cause of action for medical expenses under K.S.A. 2015 Supp. 22-4612 accrued upon Dimmick's discharge. Accordingly, the district court rejected any defense based on the statute of limitations.

10

On appeal, the issue presents a question of law turning on statutory construction and stipulated facts, so we exercise unlimited review. See *Schoenholz v. Hinzman*, 295 Kan. 786, 791, 289 P.3d 1155 (2012) (interpretation of statute of limitations presents question of law); *Greer ex rel. Farbo v. Greer*, 50 Kan. App. 2d 180, 185, 324 P.3d 310 (2014) (appellate courts have unlimited review of questions of law); *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011) (when controlling facts undisputed, issue presents question of law).

A statute of limitations bar constitutes an affirmative defense, placing the burden of proof on the defendant asserting it. *Slayden v. Sixta*, 250 Kan. 23, 26, 825 P.2d 119 (1992). A defendant seeking summary judgment based on an affirmative defense must present uncontroverted facts demonstrating the applicability of the defense as a matter of law. *Golden*, 47 Kan. App. 2d at 497 (A party asserting an affirmative defense "has an obligation to come forward with evidence on summary judgment that would allow a jury to find those facts necessary to show" the defense applies.).

For the most part, the arguments the parties have offered as to when the limitations period for a governmental claim under K.S.A. 2015 Supp. 22-4612 starts spin off the legal relationship between Stormont-Vail, as the service provider, and Dimmick, as the recipient of those services. The arguments look at either the start of that relationship or its end as the date triggering the statute of limitations. Shawnee County's approach in applying the limitations period backward from the date Stormont-Vail filed this action is typically used when a plaintiff has alleged a series of continuing wrongs occurring regularly or periodically, such as wage and hour violations. In any event, however, Shawnee County also ties the limitations bar to when services were provided to Dimmick and, thus, his legal relationship to Stormont-Vail. But Dimmick's obligation to pay Stormont-Vail, grounded in contract or quasi-contract, is legally unconnected to the liability imposed on government entities in K.S.A. 2015 Supp. 22-4612. That liability is an independent statutory duty and neither places a government entity in the shoes of the individual in custody nor imposes on the government entity the legal obligations of the

individual, as the recipient of the services, to pay for those services. The approaches the parties have pressed, therefore, effectively ignore the source of the duty in K.S.A. 2015 Supp. 22-4612 and the statutory language defining the duty—language that also informs when a government entity becomes obligated to pay for medical services.

In this respect, K.S.A. 2015 Supp. 22-4612 makes a government entity responsible for "the lesser of the *actual amount billed* by such health care provider or the medicaid rate." (Emphasis added.) The statute, therefore, requires that an amount be billed. The government entity then becomes liable for that amount or the established Medicaid reimbursement, should it be lower (which it almost invariably would be). A cause of action based on a government entity's failure to pay despite the duty imposed by K.S.A. 2015 Supp. 22-4612 could accrue no earlier than the healthcare provider's billing to that entity. That billing triggers the obligation to pay.

Arguably, a legal claim for nonpayment would not accrue until the government entity expressly refuses to pay or a reasonable time to pay passes without payment. See *State ex rel. Bremby v. Lindemuth, Inc.*, 47 Kan. App. 2d 386, 392, 281 P.3d 534 (2011) (Atcheson, J., concurring) (court should impute "reasonable time" for party to dispute required payments when administrative order provided no particular time for doing so); *Gilliland v. Board of Review*, 298 N.J. Super. 349, 353, 689 A.2d 781 (1997) (When a statute fails to include an express time limit, "a reasonable period" should be inferred.). At the very least, however, the billing is a necessary condition precedent to a medical provider's legal action to obtain payment from a government entity as provided in K.S.A. 2015 Supp. 22-4612. In turn, the 3-year statute of limitations would not begin to run at least until then.[2]

[2]A medical provider could, consistent with K.S.A. 2015 Supp. 22-4612, deliberately or inadvertently fail to bill for an extended time. During that time, the limitations period would not run, so a government entity might be confronted with a demand to pay long after the services had been provided. But those instances would be rare, since medical providers have an economic incentive to bill and collect promptly. If the delay were lengthy and the government entity's ability to defend against an action to

12

enforce K.S.A. 2015 Supp. 22-4612 were compromised as a result, the entity could assert a laches defense. See *Capitol Fed'l Savings & Loan Ass'n v. Glenwood Manor, Inc.*, 235 Kan. 935, 938, 686 P.2d 853 (1984).

The stipulated facts fail to establish when Stormont-Vail billed for the medical services provided Dimmick. The evidence on summary judgment, therefore, does not support Shawnee County's statute of limitations defense. The district court reached the correct result in denying summary judgment to Shawnee County on that basis. See *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005).

*Conclusion*

Having carefully examined the parties' arguments in light of the stipulated facts, we find the district court erred in granting summary judgment. We recognize Stormont-Vail deserves to be paid for the medical services provided to Dimmick, and some government entity is responsible for those costs consistent with K.S.A. 2015 Supp. 22-4612. We recognize also the efforts of the parties and the district court to streamline this litigation through stipulated facts and cross-motions for summary judgment. Nonetheless, the presentation of the dispute in that manner precluded judgment as a matter of law.

We, therefore, reverse the judgment for Stormont-Vail and Cotton-O'Neil Clinic and remand for further proceedings consistent with this decision.

\* \* \*

BUSER, J., concurring in part and dissenting in part:  I concur with the majority's holding that the district court did not err in concluding that Stormont-Vail's claims were not barred by the applicable statute of limitations.

13

I dissent from my colleagues' holding that the district court erred in granting summary judgment to Stormont-Vail and erred in finding that Shawnee County is liable for payment of health care services rendered to Jesse Dimmick.

The stipulated facts pertinent to resolving the liability for Dimmick's medical treatment are few in number. The critical facts show that at the time Dimmick was taken for treatment at Stormont-Vail, he was in the custody of one law enforcement officer— Deputy Forshee of the Shawnee County Sheriff's Department. There are no facts suggesting that any other law enforcement office was present or had custody of Dimmick at the time treatment was sought at the medical center. Deputy Forshee had personally accompanied Dimmick in the ambulance from the crime scene to Stormont-Vail. Dimmick received treatment at the medical center from September 12, 2009, until September 29, 2009. Upon discharge, Dimmick was taken by three officers from the Shawnee County Sheriff's Office who "handcuffed and escorted the wheelchair bound Dimmick out of Stormont-Vail and took him to the Shawnee County jail." Subsequently, on October 28, 2009, and November 25, 2009, Shawnee County officers "transported Dimmick to Stormont-Vail for additional treatment, and returned him to the jail each time."

Given the stipulated facts, the district court applied K.S.A. 2015 Supp. 22-4612(a) which provides:

> "Except as otherwise provided in this section, a county, a city, a county or city law enforcement agency, a county department of corrections or the Kansas highway patrol shall be liable to pay a health care provider *for health care services rendered to persons in the custody of such agencies* the lesser of the actual amount billed by such health care provider or the medicaid rate." (Emphasis added.)

In interpreting a statute, an appellate court applies the ordinary meaning to the common words found in the statutory language. See *Cady v. Schroll*, 298 Kan. 731, 738,

14

317 P.3d 90 (2014). As I read K.S.A. 2015 Supp. 22-4612(a), the critical factor determining liability for health care services is what entity has custody of the person *at the time the services are rendered.* Although the majority and Shawnee County emphasize that multiple agencies were involved in the joint law enforcement effort to pursue, apprehend, and arrest Dimmick, at the time Dimmick was taken to Stormont-Vail for treatment, he was solely in the custody of Shawnee County Deputy Forshee. Moreover, on the two later occasions when Dimmick was taken to Stormont-Vail for treatment, he was also in the custody of Shawnee County law enforcement officers. Applying K.S.A. 2015 Supp. 22-4612(a) to these stipulated facts and employing our longstanding standard of review for summary judgment matters, it is apparent that Shawnee County is liable for the medical services rendered to Dimmick at Stormont-Vail.

This conclusion is bolstered by our Supreme Court's guidance in *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 348 P.3d 602 (2015). In *University of Kan. Hosp. Auth.*, a Kansas Highway Patrol (KHP) trooper engaged in a high-speed car chase which resulted in the driver, Wayne Thomas, striking a tree. Thomas was handcuffed and arrested. After the trooper placed Thomas in his patrol vehicle, Thomas began complaining of pain and asked to be taken to the hospital. The trooper drove Thomas to the emergency room at University of Kansas Medical Center and escorted him inside. No handcuffs were removed until the nurses began to examine Thomas. After the trooper remained at the hospital for about an hour, the nursing staff reported that Thomas would be admitted overnight. Thereafter, the trooper instituted a "'police hold'" on Thomas, which meant that he wanted the hospital to call the agency before releasing Thomas. 301 Kan. at 995. The next day, the hospital called and the trooper picked up Thomas and transported him directly to the Wyandotte County Jail. Of note, no KHP troopers guarded Thomas during his hospital stay. The hospital authority sought payment for health care services rendered to Thomas. Both KHP and Wyandotte County refused to pay, resulting in litigation.

15

In *University of Kan. Hosp. Auth.*, our Supreme Court held that in enacting K.S.A. 2015 Supp. 22-4612(a) "the Kansas Legislature clearly adopted custody as the trigger for payment liability when an indigent offender receives medical care." 301 Kan. at 999. After surveying caselaw regarding the government's duty to provide care for prisoners within its custody, the Supreme Court concluded that the determination regarding which law enforcement agency is responsible for medical costs of indigent prisoners depends on the law enforcement agency "having custody of the indigent offender *at the time the decision is made to obtain medical treatment for the offender*." (Emphasis added.) 301 Kan. at 1006. Applying K.S.A. 2015 Supp. 22-4612(a) to the facts involving Thomas' receipt of medical care, our Supreme Court held: "Thomas was under arrest and in KHP's custody *at the time he was taken to the hospital for treatment*. Based on that custody, KHP was liable for Thomas' reasonable medical expense under K.S.A. [2015 Supp.] 22-4612(a)." (Emphasis added.) 301 Kan. at 1007.

*University of Kan. Hosp. Auth.* clarifies that the statutory "trigger for payment liability" is the prisoner's custody "at the time the decision is made to obtain medical treatment for the offender." 301 Kan. at 999, 1006. In other words, the law enforcement agency which has custody of the prisoner *at the initiation* of medical treatment by the health care provider is liable for the services rendered by that provider. Accordingly, in *University of Kan. Hosp. Auth.*, the trigger which made the KHP liable occurred when Thomas was initially taken to the hospital for treatment while in the custody of the trooper.

Similarly, in the present case, at the time Dimmick was transported from the crime scene and initially taken to Stormont-Vail for medical treatment, he was in the sole custody of Deputy Forshee. And on two subsequent occasions, Dimmick was in the sole custody of the Shawnee County Sheriff's Department when he was taken to Stormont-Vail for treatment. In sum, on all three occasions for which a law enforcement agency sought treatment for Dimmick by taking him to Stormont-Vail, the pertinent stipulated facts prove that he was in the sole custody of Shawnee County Sheriff's Deputies.

16

The district court did not err. Based on the relevant stipulated facts, a plain reading of K.S.A. 2015 Supp. 22-4612(a), and considering our Supreme Court's guidance in *University of Kan. Hosp. Auth.*, I would find, as a matter of law, that Shawnee County is liable to reimburse Stormont-Vail for the health care services provided to Dimmick.